PILLSBURY (WHITHED v.). See Case No. 17,572.

## Case No. 11,168.

### The PILOT.

[1 Biss. 159.] [1]

Circuit Court, D. Michigan. June Term, 1857.[2]

RULES OF NAVIGATION — EXCEPTIONS — STEAMER MEETING SAIL VESSEL — ANSWER — WHEN SUFFICIENT—WHEN SAILING VESSEL SHOULD CHANGE HER COURSE.

1. There are exceptions to the general rules of navigation, for which no regulations can be provided. Under such circumstances each vessel should be managed with care and skill, to avoid a collision, and if there be a failure to do this, though a vessel be within the rule, she can claim no damages for injuries received. A strict adherence to the rule, which necessarily leads to a collision, affords no excuse to a vessel.

2. A steamer is required to give way to a sail vessel; yet, if she cannot do so without peril, the sail vessel must avoid her. It is no objection to the jurisdiction, that the sail vessel was less than twenty tons burden, nor that the collision was near the Canada shore.

3. An answer which sets up facts constituting negligence is sufficient, though no fault be formally charged. The rules of pleading in admiralty are less technical than at law.

4. The master of a steamer has a right to expect that an approaching sail vessel will change her course if she can do so without risk, and any other course will involve danger of collision.

5. No sail vessel which recklessly attempts to cross the line of a steamer when there is no necessity for doing so, and when the steamer could not give way without encountering peril, can be entitled to recover for an injury received.

[Appeal from district court of the United States for the district of Michigan.]

In admiralty.

Mr. Newberry, for libellant.
Mr. Duffield, for respondent.

McLEAN, Circuit Justice. The schooner Pilot, being on a voyage down the Lakes from Ellen creek, on Lake Huron, to Kingsburgh, on Lake Erie, on the 10th of June, 1856, at about half-past eleven in the fore-

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]
2 [Reversing Case No. 8,849.]

noon, the wind blowing from the south-east, was beating down the Detroit river, and while steering from the American to the Canada side of the river, a little below Bois Blanc Island, the steamboat Pearl ran into the Pilot, cut through her hull, shear, bulwarks, decks and rigging, and destroyed her cargo in part, and caused her to fill with water so as to be damaged.

It is alleged in the libel that at the time of the collision, it was broad daylight; that the schooner kept her course, as she was bound to do, and that the collision occurred near the Canada bank, there being sufficient space for the Pearl to have passed the schooner, as the channel there is nearly half a mile wide, but she made no effort to avoid the schooner.

The answer states that the Pearl, being on a trip up the Detroit river to Detroit, when near to Malden saw the schooner beating down the river and heading towards the Canada shore, nearly abreast of the buoy, which was upon the shoal off Fort Malden; that the brig America, at the same time, occupied the center of the channel nearly abreast of the schooner, holding up the river, and when the schooner was about five hundred feet from the Pearl, her helm was ported and engine checked, and immediately afterwards her helm was put hard a-port, and her engine stopped; that the Pilot at that time was close upon the channel bank, so that it was supposed she would heave in stays, to avoid running on the shore: that the master of the Pearl intended to run inside of the Pilot, steering close to the channel bank; that he adopted that course because the Pearl was long, sharp, and difficult to steer, and if he had attempted to pass the right side of the Pilot, and it had gone about, a collision between the Pearl and the Pilot, or the brig would have been unavoidable.

The channel at the place of collision is between one-half and a quarter of a mile wide. The master of the Pilot says the brig was in about the middle of the river, sailing up the stream; there might have been, he says, fifteen or twenty rods between us. Had the Pearl put her helm a-starboard, a few minutes before the collision, he says, she would have passed our stern.

John Cary, master of the brig, says: "About mid-day when I was abreast of Fort Malden, I saw a small vessel beating down to the leeward of me. She was by the wind, with her starboard tacks aboard. At that time my vessel was about one-half the way across the channel from the fort. I was not certain from the position of the two vessels, that I should go clear of her. I called to her and asked her to go about. Some kind of an answer was made to me, which I did not understand. He did not go about. He stood along and just cleared our jib-boom. I think the vessel was the Pilot. After passing our bow she came up partly in the wind, and I supposed she intended to go about, but then

he up helm again, and kept her off with a good full on her and sweeping down the current, the steamer Pearl ran foul of her, striking her near her main rigging. At the time of the collision, the Pearl was backing her engine. The two vessels were more than the Pearl's length apart, when the Pearl stopped her engine. Except the backing, he observed no effort of the Pearl to keep out of the way. Prior to the collision, my vessel was between the Pearl and schooner, so that the schooner could not have been seen from the Pearl. The collision occurred in slack water, close to the channel bank. The Pearl was running so close to the bank that she could go no further to the right. The Pilot, I think, was right on the channel bank, near the buoy, at the time of the collision. The Pearl could not have changed her course to the right, and had she passed to the left, when the schooner first came round my bow, by starboarding her helm, it was an even chance to avoid a collision either way. I saw it was a pretty bad smash-up."

The damages in this case are but of small amount, but the decision, it appears to me, involves an important principle. It is whether the facts of the case do not constitute an exception to the general rule of navigation, as laid down by the supreme court. After much reflection I have come to the conclusion, that under the circumstances, the steamer was not in fault in keeping her course.

To all general rules there are exceptions, arising from the nature of the case, and to which a general regulation can have no application. In such a case each master or officer in command is bound to act under the exigencies, with that skillful seamanship which the officers of each vessel are supposed to possess, and especially the masters. In the case of St. John v. Paine, 10 How. [51 U. S.] 557, the court says, of sailing vessels: "A vessel that has the wind free, or sailing before or with the wind, must get out of the way of a vessel that is close-hauled, or sailing by or against it; and the vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences." And, further: "Steam vessels are regarded in the light of vessels navigating with a fair wind, and are always under obligations to do whatever a sailing vessel going free or with a fair wind would be required to do, under similar circumstances. Their obligation extends still further, because they possess a power to avoid the collision, not belonging to sailing vessels, even with a free wind, the master having the steamer under his command, both by altering the helm and stopping the engines. * * * As a general rule, therefore, when meeting a sailing vessel, whether close-hauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her."

But in the same case, the court says: "These rules have their exceptions in extreme cases, depending upon the special circumstances of the case; and in respect to which no general rule can be laid down or applied. Either vessel may find herself in a position at the time, when it would be impossible to conform to them, without certain peril to herself or a collision with the approaching vessel. Under such circumstances the master must necessarily be thrown upon the resources of his own judgment and skill, in extricating his own vessel as well as the vessel approaching, from the impending peril. These cases cannot be anticipated, and therefore cannot be provided for by any fixed regulation. They can only be examined, and the management of the vessel approved or condemned, as the case may arise."

In the case of The Hope, 1 W. Rob. Adm. 154, it was argued, that if it was in the power of one of the vessels which came into collision to have avoided the collision by giving way, she was bound to have done so, notwithstanding the rule of navigation. This the court admitted to be true, as a general proposition; and that no vessel should unnecessarily incur the probability of a collision, by a pertinacious adherence to the strict rule of navigation.

In the case of The Lady Anne, 15 Jur. 18, in answer to Dr. Lushington's questions, the Trinity masters said: "We admit that the general rule is, that where two vessels are close-hauled, the one on the larboard tack is to give way, and the one on the starboard tack to keep her luff; this rule does not excuse the vessel on the starboard tack not taking other measures to prevent the collision, if circumstances render it necessary. In this case, we think the Lady Anne should have put her helm down, and have eased off the head sheets. These measures she did not adopt. Had this been done, we think the collision might have been avoided; therefore the Lady Anne is to blame." Dr. Lushington adopted the view of the Trinity masters, and pronounced for the damage and costs.

"The law recognizes no inflexible rule, the neglect of which by one party will dispense with the exercise of ordinary care or caution in the other. A man is not at liberty to cast himself upon an obstruction, which has been made by the fault of another, and avail himself of it, if he does not use common and ordinary caution to be in the right." "Two things must concur to support an action for a collision. It must be a collision by the act of the defendant, and no want of ordinary care to avoid it, on the part of the plaintiff." Sills v. Brown, 9 Car. & P. 601.

On the above principle I assume the ground, that the Pilot did not exercise that caution and skill which were necessary to enable her to recover damages in the case. In the answer, the Pearl does not charge the Pilot with fault in form, but the facts are

stated, from which the court cannot but see it did not avoid the collision when it might and should have done so. The rules of pleading in admiralty are less technical than at law.

The Pearl was ascending the river on the Canada side, close to its channel bank. On the approach of the Pilot, at an angle, perhaps, of about forty-five degrees, crossing the bow of the Pearl, its helm was ported, throwing its starboard wheel on the mud of the channel bank. She stopped her engine, and reversed its action. She could do no more than this with safety.

It is said she might have thrown her helm a-starboard, and passed the stern of the Pilot. This would, in all probability, have caused a collision with the Pilot or the brig, which was only a few hundred feet from the Pearl. The Pilot was heading from the American, towards the Canada shore; she was close-hauled to the wind, and, it is said, could not alter her course. The wind was light. She was beating down the river, and could, in that mode, make progress only by an angular course from one shore of the river to the other. This is admitted; but she could tack or heave in stays in any part of the river with as much ease and more certainty than when near to either shore. She might have drifted out of the river, by throwing her broadside to the current, or by using sufficient sail to keep her head to the current, so as to be carried by it stern first. When the wind is across the current, in tacking, there is great danger of missing stays on the lee shore.

Could the master of the Pearl, under the circumstances, suppose that the Pilot would continue her course across the river until she struck the Canada shore? Her destined port was a long distance below Malden, and she had no occasion to land at that place. Such a supposition could only have been founded on the ignorance or perverseness of the master of the Pilot. On the contrary, the master of the Pearl did expect, and had a right to expect, under the circumstances, that the Pilot would turn about, as she might do without risk, before she approached the shore or came in collision with the Pearl.

The master of the brig is a disinterested and an intelligent witness. A want of skill in the master of the Pilot is shown, by crossing the bow of the brig so slowly as to touch her jib-boom. The master of the brig called on the Pilot to turn about, but he continued his course regardless of consequences. He only escaped a collision with the brig by a few feet. And seeing the position of the Pearl on the shore channel of the Canada side, the master of the brig said, to use his own words, he saw there "would be a pretty bad smash-up." So near was the Pilot to the Pearl, directly after she passed the bow of the brig, that the collision in a few minutes occurred. The master of the Pearl did what he could to avoid a collision, except

that of starboarding his helm, which would, in all probability, have brought his vessel in collision with the brig, and certainly with the Pilot, had she gone about, as every competent and prudent seaman would have done.

Had there been no vessel to the larboard side of the Pearl, which would have been endangered by putting her helm hard a-starboard, she should have done so, and passed the stern of the Pilot; but no master of a vessel, however small it may be, can be presumed to be so ignorant or reckless as to run into danger when he could avoid it. No sail vessel which recklessly attempts to cross the bow of a steamer, when there was no necessity for doing so, and when the steamer could not give way without encountering peril, can be entitled to recover damages for an injury so received.

In The Santa Claus [Case No. 12,327], it was said by the court, that the question of culpable negligence is not determinable absolutely by any rule of navigation; that these rules are not inflexible, and a vessel which adheres to them in form may still be at the same time guilty of a tortious injury to another which fails to observe them. It is eminently proper that a strict observance of any of these regulations should be avoided, when there is a plain risk in adhering to them, and it is entirely in the power of either vessel to escape a collision by departing from the methods provided by the rules. In the case of The Friends, 1 W. Rob. Adm. 478, Dr. Lushington discusses the effect of extraordinary contingencies, and holds that they must afford exceptions to the standing rule, however positive its terms may be; and in that case admitted a vessel, though out of the required course, to recover damages sustained from a collision in that situation.

The vessel claiming damages must show that she did not contribute to the collision. Admitting that the other vessel is not within the rule of navigation, she must be avoided if it can be done by the exercise of a reasonable caution and skill. To run on a vessel, because she is not within the rule, taking no care to avoid her, though the colliding vessel be within the rule, is culpable. The rules of navigation are addressed, not only to intelligent persons, but to persons supposed to be skilled in seamanship; and they are to be observed in such manner as not, willingly or negligently, to inflict an injury, under the pretense of observing the rule.

It was objected to the jurisdiction in this case, that the Pilot is a vessel under twenty tons burden as provided in the act of 1845 (5 Stat. 726). That was a special act to authorize the "jurisdiction of the district courts in matters of tort and contract, arising in, upon, or concerning steamboats and other vessels of twenty tons burden and upwards, * * * on the lakes and navigable waters connecting said lakes, &c." But the admiralty juris-

diction now exercised between two or more states, over navigable waters, is not derived from the act of 1845, but from the constitution and the act of 1789 [1 Stat. 73], under which act the maritime jurisdiction extends to vessels of ten tons and upwards.

It was also objected that the wrong complained of took place on the Canada shore, and without the jurisdiction of the United States. By our treaty with England, of 1842, it is specially provided, that the channels in the river Detroit on both sides of the Island Bois Blanc, and between that island and both the American and Canadian shores, and all the several channels and passages between the various islands lying near the junction of the river St. Clair. with the lake of that name, shall be equally free and open to the ships, vessels and boats of both parties.

For the reasons above stated, the decree in the above case is reversed, at the costs of the libellant.

NOTE. See The Delaware [Case No. 3,760]; The Empire State [Id. 4,474]. If the collision is occasioned by an alteration of the course of the sailing vessel, it devolves upon her to prove the necessity or propriety of such movement. If by changing her course without necessity to cross the bow of a steamer, so near to the latter, that stopping and backing the engine did not avoid a collision, she cannot support an action for the damages thereby occasioned. The William Young [Id. 17,760].

Where a vessel is tacking in a river or narrow channel, a vessel approaching her under the pressure of an obligation to avoid her, has, in general, the right to assume that she will beat out her tack; but this presumption must yield to peculiar exigencies. The Vicksburg [Case No. 16,932.] A vessel has a right to assume that other vessels will act in obedience to statute regulations (The Ariadne [Id. 525]), and will beat out their tack (The Vicksburg [supra]). As to duty of sailing vessel to beat out her tack, see Whitney v. The Empire State [Case No. 17,586]. As to right so to do, The Argus [Id. 521].

Where a steamer and sailing vessel are approaching each other on courses that may lead to a collision, the steamer cannot be excused for holding her way upon the hypothesis and belief, that the sailing vessel cannot with safety to herself keep her tack, but must go about or come into the wind before they meet. The Washington Irving [Case No. 17,243]. A sailing vessel has, however, no right to persist in her course in such a manner as to make a collision probable, or to drive the steamboat into danger or exposure in order to avoid her. The Cornelius C. Vanderbilt [Id. 3,235]. Nor is she entitled to impose upon the steamer the duty to guarantee her against a collision. The New Champion [Id. 10,146].

———

PILOT. The (GALLATIN v.). See Case No. 5,199.

———

### PILOT-BOAT.

[Note. Cases cited under this title will be found arranged in alphabetical order under the names of the vessels; e. g. "The Pilot-Boat Blossom. See Blossom."]

———

PILOT NO. 2, The (FOSTER v.). See Case No. 4,980.

PINCKNEY. The GENERAL C. C. See Cases Nos. 5,308 and 5.309.

PINE (WEST v.). See Case No. 17,423.

PINGREE (UNITED STATES v.). See Case No. 16,050.